UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,               Crim. Case No. 17-20781

v.                                  Paul D. Borman
                                  United States District Judge

REMOND GORDON,

               Defendant.

                            /

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant Remond Gordon has been charged in a one-count indictment with Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). The indictment arises from the seizure of a pistol from Defendant's passenger Ms. Brieanna Expose by the Michigan State Police during a routine traffic stop.

Defendant moves to suppress the seized firearm as evidence, alleging that Trooper Benjamin Sonstrom unlawfully prolonged the traffic stop without reasonable suspicion, and that the firearm was discovered in a search conducted after such prolongation. For the reasons that follow, the Court finds that there was a violation of Defendant's rights under the Fourth Amendment, and therefore grants Defendant's Motion to Suppress.

# I. BACKGROUND

Trooper Benjamin Sonstrom pulled Defendant over on southbound Interstate 275 in Romulus, Michigan at approximately 2:10 PM on July 12, 2017, for following too closely. (ECF No. 21, Gov't Resp. Ex. A, Incident Report.) Sonstrom was driving a fully marked patrol car, which was parked in the median of Interstate 94 just east of the juncture between I-94 and I-275, when he observed Defendant's vehicle "travelling at approx[imately] 1-2 car lengths behind the vehicle that was in front of it at freeway speeds." (*Id.* at 1, Pg ID 131.) Sonstrom illuminated his emergency lights, and Defendant pulled over on the shoulder of Interstate 275. (*Id.*)

## VIDEO OF TRAFFIC STOP

Defendant has introduced into evidence a video of the traffic stop and subsequent arrest from Sonstrom's dashboard camera. (ECF No. 19, Def.'s Mot. Ex. A, Video.) The factual summary that follows reflects the events of the traffic stop as they are depicted in the video, except where otherwise noted.

After exiting his patrol vehicle, Sonstrom approached the passenger side of Defendant's vehicle, advised Defendant that he had pulled him over for driving too closely to the car in front of him, and requested Defendant's driver's license, registration, and proof of insurance. (Video at 02:10:09-02:10:36.) Defendant hands Sonstrom certain items, and Sonstrom asks the passenger in the vehicle, Ms. Brieanna Expose, whether she has identification as well. (Video at 02:10:37-

2

02:11:10; Incident Report at 1, Pg ID 131.)

Sonstrom tells Defendant that he is going to run his registration, and asks Defendant to stand in front of Sonstrom's car so that he can communicate with him more easily. (Video at 02:11:42-02:11:50.) Defendant asks Sonstrom whether he is required to exit his car, to which Sonstrom responds that he does, adding that he couldn't hear him easily from where he was seated in the car. Defendant asks again whether he has to exit his car, and Sonstrom responds in the affirmative. Defendant asks whether he has to leave his car even if he does not want to, and Sonstrom responds that he is legally required to do so, and "can go to jail for resisting and obstructing a police officer." (Video at 02:11:50-02:12:20.)

Defendant exits his vehicle and approaches Sonstrom, who explains to Defendant that he needs to "run your stuff" and that he could not hear Defendant when Defendant was still seated in his car. Sonstrom asks Defendant if he has any weapons on his person, and asks to see his waistband. Sonstrom gets into the driver's seat of his patrol vehicle while Defendant remains outside on the passenger side, and the two men speak through the open passenger-side window:

> Sonstrom: Do you want to sit in here, or no?
> Defendant: Uh, do you mind if I just stand out here?
> Sonstrom: That's cool, man. How are you doing today?
> Defendant: I can't complain. How about yourself?
> Sonstrom: All right.

(Video at 02:12:28-02:13:10.) Sonstrom proceeds to ask Defendant a series of questions, and in the course of that conversation Defendant indicates the following: (1) the car is registered in his name; (2) Ms. Expose is "just a friend"; (3) Defendant and Expose were on their way to a car auction in Carleton, Michigan; (4) Defendant intends to buy a car at the auction, but that has not decided what kind of car; (5) Defendant's driving record is "fair" and his license is not suspended. (Video at 02:13:11-02:14:28.)

Sonstrom and Defendant then have the following exchange:

Sonstrom: Listen. My computer is slow for whatever reason. You ever been in trouble for anything before?

Defendant: No, sir.

Sonstrom: You ever been arrested?

Defendant: Um, sir—I mean, I'm not being disrespectful, but, I mean, is this a traffic stop, or what's going on? I'm just not trying to be disrespectful, but what's going on?

Sonstrom: I just, it's—I'm communicating with you. It's part of my job. You know what I'm saying?

Defendant: Okay.

Sonstrom: So—

Defendant: I mean, if you don't mind, I'd just rather—I mean, if you're going to write me a ticket or whatever, I'd just kind of rather at this point remain silent.

Sonstrom: Hang tight for me for a minute, okay?

Defendant: Sorry?

Sonstrom: Hang tight right here. I'll be right back.

(Video at 02:14:29-02:15:03.)

Sonstrom approaches the passenger side of Defendant's vehicle to speak with Ms. Expose. They speak for approximately 45 seconds, and while their conversation is not fully audible in the video, Sonstrom described it as follows in the incident report:

> I briefly exited my car and made contact with the passenger, EXPOSE. She was playing a video game on her phone. I asked where she was heading and she said she was just riding. She advised she was going to hang out with GORDON. She could not tell me exactly where she was heading.

(Incident Report at 2, Pg ID 132.)

Sonstrom gets back into his patrol vehicle, and over the next minute and a half, he can be heard in the video speaking into his radio in short intervals. Specifically, Sonstrom can be heard communicating his location on Interstate 275, and then reading an eight-digit number into the radio. (Video at 02:16:00-02:17:33.) Sonstrom tells Defendant, who is still standing outside of Sonstrom's passenger-side window, that he is going to roll up the window to make a phone call. Defendant asks if he can go back to his car, and Sonstrom tells him that he can wait in front of the patrol vehicle, but not get back into his car yet. (Video at 02:17:34-02:17:49.)

Sonstrom then places a call, stating: "I am on a traffic stop, and I need to run an individual—two people in a car, please. Thanks." (Video at 02:18:28-02:18:45.) Shortly thereafter, a voice on Sonstrom's radio states: "I'm showing a couple of

felony 3500s from '91 and '92, and a felony 5200 from '99." (Video at 02:19:22-02:19:42.)

About a minute and 20 seconds later, Sonstrom can be heard making a phone call apparently regarding the traffic stop: he provides his name and a four-digit number, identifies his location, states "it's going to be 'following too close,'" and provides identifying information about Defendant. (Video at 02:21:00-02:22:24.) Sonstrom then radios to ask whether there are any female officers in the area, and is told that a female officer would come to the scene within about five minutes. (Video at 02:24:50-02:25:15.) Ten seconds after that, Sonstrom can be heard saying: "Okay. Pull up previous queries. I'm trying to see if one was mine or not." After a 15-second pause, he says: "Okay. That wouldn't have been me. That's okay. If that's the most recent one, don't worry about it." (Video at 02:25:25-02:25:56.) About 30 seconds later, he says: "What's the NADDIS number?[1] Okay. Okay. Um, that's okay. Yep." Sonstrom then identifies "the second subject" as Ms. Expose, spells her name, and provides identifying information. (Video at 02:26:31-02:27:34.)

Approximately three minutes later (and by this time approximately 20 minutes into the traffic stop), Sonstrom apparently receives a second phone call:

---

[1] Sonstrom's reference to a "NADDIS number" relates to the government's assertion that "[a]t approximately 2:26pm, Trooper Sonstrom . . . learned that Gordon had a positive NADDIS hit (Narcotics [and] Dangerous Drugs Information System)—indicating that Gordon was under investigation by the DEA." (Gov't Resp. at 4, Pg ID 120.)

6

Ma'am, can I put you on hold for one second? Okay.

Hey, bro. Sorry, I'm on with Epic.[2] What's cooking? Yeah. Oh. Okay. No, I—he looks very familiar. I'm trying to figure the guy out. Let me finish with Epic and I'll call you right back. Good to know. Yeah, bye.

Hello? You know what? Okay. Anything on—negative for her? Okay. I'm good, I'm on the phone with DEA now, so I'm all set. Thank you. Yeah, bye.

(Video at 02:30:16-02:31:06) Sonstrom requests additional backup on his radio, and a few seconds later, he says: "Is that the NADDIS number?" He then confirms his location on I-275 over the radio for the backup trooper he had requested. (Video at 02:31:30-02:32:26.)

Then, after about twenty seconds of silence, Sonstrom can be heard laughing, and then saying the following:

What did I stop him for? Did I get anything? Out of where? Okay. Yes, yes, yup, yup. He came out of the Dollar Store or something, right? Or the Aldi's, or whatever it was. Okay. He's being real evasive. Denied a criminal history. He's got a girl in the car. Says he's going to car auction but doesn't know what kind of car he's getting. She says she's just riding, going to spend time with her boy. They're doing something up to no good, you know? Well, hopefully today will be that day, so. Okay. I will. Thanks. Yeah, bye.

(Video at 02:32:43-02:34:05.)

After Sonstrom concludes the call, Defendant approaches the passenger side

---

[2] Sonstrom later testified that "EPIC," short for the El Paso Intelligence Center, is a law enforcement database run by the Drug Enforcement Administration. (ECF No. 25, Transcript of April 30, 2018 Hearing at 12:11-13.)

of his patrol car, and the two men have the following exchange:

> Defendant: What's going on, sir?
>
> Sonstrom: I've got to finish doing all of my investigation work here.
>
> Defendant: I'm sorry?
>
> Sonstrom: I've got to finish doing all of my work here.
>
> Defendant: Can I sit inside of the car?
>
> Sonstrom: Nope, not yet. You've got to give me a second. I'll be out with you in two seconds.
>
> Defendant: I mean, I haven't done a crime, right? My license is valid, my plates is valid. If you're going to give me a ticket, then I respect that, but—
>
> Sonstrom: I'm going to come out and talk to you right now, okay?

(Video at 02:34:06-02:34:30.)

Defendant walks away from Sonstrom's passenger-side window, and stands where he had been standing between the two cars. Twenty-five seconds later, a female trooper surnamed Zonca arrives. Zonca and Sonstrom have the following conversation:

> Sonstrom: Hey, what's cooking?
>
> Zonca: Hey, what's up?
>
> Sonstrom: So this guy here, he's going to the auto auction, so he says.
>
> Zonca: Okay.
>
> Sonstrom: The girl says they're just going to spend some time together. I've stopped him for the DEA. He's got multiple DEA things going on, but they've just had trouble proving them, but I've spent like 2 hours searching his car before. He just wants his ticket and wants to go. Uh, he's just—he's dirty. So—

8

Zonca: Did you talk to her at all?

Sonstrom: Yeah, yeah, they're going to spend some time somewhere. She's just riding. They're not going to the auction. That's just his—his thing. So I'm going to get her out in a second, and I'm going to run my dog. I don't know what he's going to do. He's dirty. I worked with him—I've worked him up on a DEA before.

(Video at 02:34:50-02:35:30 (emphasis added).)

Troopers Sonstrom and Zonca exchanged a few words about police dog protocol, with Sonstrom complaining about not having immediate availability of the dog:

Sonstrom: Bloom's got to stop calling for these local dogs, man. That shit's got to stop, man.

Zonca: He's got to do what? I didn't hear you.

Sonstrom: Bloom's got to stop calling for local dogs—

Zonca: Oh, I didn't hear.

Sonstrom: —when there's dogs out and say they're en route.

Zonca: I didn't even hear him.

Sonstrom: Yeah. Does it all the friggin' time.

(Video at 2:35:30 – 2:35:50.)

Then Sonstrom and Zonca approach Defendant and his vehicle, while Trooper Diroff, who arrived with Zonca, remains by the patrol car. (Video at 02:35:32-02:35:47.) The ambient highway noise drowns out most of what is said by Sonstrom and Defendant.

From the time at which Expose exits the vehicle until the point at which Zonca

9

discovers the pistol in Expose's bag, the video does not make clear whether Defendant and Expose were "trying to communicate [in a] whispering/covert action," chiefly because Defendant is not fully visible in the frame and the quality is too blurry to perceive Expose's facial expressions. (Video at 02:37:55-02:39:40.)

By the time Zonca discovered the pistol and the officers handcuffed Defendant and Expose, the stop had lasted approximately 29 minutes. Thereafter, Sonstrom conducted a dog search of the vehicle.[3] (Video at 02:44:50-02:48:50.)

On February 9, 2018, Defendant filed the instant Motion to Suppress Evidence. (ECF No. 19, Def.'s Mot.) The government filed a Response to Defendant's Motion to Suppress on February 21, 2018. (ECF No. 21, Gov't Resp.) This Court conducted an evidentiary hearing on Monday, April 30, 2018.

**RELEVANT APRIL 30, 2018 EVIDENTIARY HEARING TESTIMONY OF TROOPER SONSTROM**
**DIRECT TESTIMONY OF TROOPER BENJAMIN SONSTROM**

Trooper Sonstrom works "the Hometown Security Team" which is criminal interdiction team with a canine. "Our main focus is . . . to interdict or interfere with transfer of smuggling of narcotics, firearms, weapons . . . , based around Detroit [I] 75, 94, 275. (ECF No. 25, Transcript of April 30, 2018 Evidentiary Hearing

---

[3] Sonstrom's incident report states that although the drug-detection dog alerted to the presence of narcotics on the passenger door of the vehicle and on Defendant's wallet, a detailed search of the vehicle did not turn up any contraband. (*Id.*)

(hereinafter "**TR.**") P. 7.2. In addition to the checks of the driver's and passengers record on his car computer – license plate, registration, driving history, and checks for outstanding warrants [LEIN – Law Enforcement Information Network] "we will run the driver . . . through EPIC. EPIC, the El Paso Intelligence Center . . . run by the DEA in Texas . . . ." TR. P. 12.

Sonstrom also contacts dispatch to run the SID number to look for criminal history. It usually comes back "anywhere from a minute to five, ten minutes . . . ." TR. P. 14.

Sonstrom testified that he doesn't always run the driver on EPIC just if "there's criminal indicators or any kind of suspicion of a crime being afoot . . . ." TR. P. 15. Response can take, "the shortest time is 3-4 minutes and I've had them in excess of 20 minutes." TR. P. 16.

Sonstrom thought Defendant was confrontational because he didn't want to exit his car until he told Defendant he had to, by law. TR. P. 20.

Sonstrom testified that Defendant denied having been in trouble, TR. P. 23, and that he was evasive to his general questions, and wanted the ticket and to go. TR. P. 24.

Sonstrom testified that dispatch advised him that Defendant had a criminal history: "I believe it was narcotics and firearms." TR. P. 26.

Sonstrom had not decided to write Defendant a traffic ticket, because he

wanted to do more investigation on crimes by running Defendant through EPIC. TR. P. 27. He then checked with the DEA to see if Defendant had a NADDIS number in its system, he did have a NADDIS number; found out that there was narcotics and weapons arrest, and that he was being investigated by the DEA. The DEA told Sonstrom that Sonstrom had previously stopped Defendant for the DEA in the past. Sonstrom testified then that he then recognized Defendant as a person he'd stopped previously on Gratiot Avenue in Detroit. TR. PP. 28-29.

Sonstrom testified that he then said "Hopefully today will be that day" – that he was "hoping that we're going to find some contraband inside of the vehicle." TR. PP. 29-30.

Sonstrom called for backup, and female Trooper Zonca arrived, along with male Trooper Diroff and K-9 Otto. Zonca went to talk to the passenger, had her come out and patted her down. TR. PP. 31, 33. At this time, Sonstrom hadn't decided whether to issue a ticket or let Defendant go with a warning. TR. P. 33

**CROSS EXAMINATION**

Trooper Sonstrom said he stopped Defendant for violating Michigan Vehicle Code 257.643, that deals with civil infractions including distance between vehicles, that specifies "reasonableness" as the standard for distance, and that it is left up to him to determine of what is reasonable. TR. P. 37.

Sonstrom testified that his objective in pulling Defendant's car over for the

traffic violation was to issue him a citation or verbal warning. TR. P. 39.

While Trooper Sonstrom had initially testified that he felt Defendant was confrontational in not following his initial request to leave his car, by asking "Do I have to get out of the car," TR. P. 20, his testimony later changed: "I wouldn't say it's confrontational, but it's suspicious based on reasonableness," and when Sonstrom told Defendant the law required that he follow that request, Defendant exited his car. TR. P. 42.

In response to the defense attorney's question of why Sonstrom continued questioning Gordon after he produced his automobile documents, "you . . . wanted to further investigate him for other matters?" Sonstrom testified "Correct . . . . Well, we need to make sure that his license is valid . . . that he has no warrants. We need to make sure that there's not a crime afoot." TR. P. 46.

Trooper Sonstrom testified that he asked Defendant whether he'd been in trouble before, and Defendant said "no." Sonstrom said he understood his question to mean: "It means had you ever been arrested." Then when Sonstrom followed up with the specific question, have you ever been arrested, and Defendant didn't answer that question, Sonstrom agreed that Defendant said, this is just a traffic stop and I'm not trying to be disrespecting, but what's going on. TR. P. 53. Then in answer to defense counsel's question:

> Q. So he was not untruthful when you asked him if he had been arrested before, is that fair?

A. Correct.

TR. P. 54. Sonstrom added that this exchange was suspicious because other people would give you a yes or no answer. TR. P. 54.

Sonstrom testified that up to 21 minutes into the traffic stop he didn't have any idea that a crime was being committed. "I had suspicion, wasn't sure what kind of crime." TR. P. 55. Sonstrom testified he got Defendant's SID number back before he talked to EPIC and that "there was narcotics and weapons violations." TR. P. 56.

Sonstrom then testified that "SID number is arrests not convictions," and he "never confirmed whether he had been convicted of weapons violations," and never confirmed whether he had just been arrested for narcotics as opposed to convicted. TR. P. 57.

Sonstrom told dispatch or EPIC:

"They're doing something up to no good, you know."

"I had suspicion of a crime, unknowing what kind of crime."

Q. "And then, so hopefully today will be that day?"

A. Yes, sir.

TR. P. 60.

As to Sonstrom's previous contact with Defendant, when he had searched his car, he didn't find any narcotics, and Defendant had not been arrested. TR. P. 62.

As to his information about Defendant on the instant case, Sonstrom just knew that he was under DEA investigation, "he was under investigation about the exact

specifics of charges or not charges I was unclear of." TR. P. 62.

Sonstrom testified that the weapon was taken out of the passenger's purse approximately 29-30 minutes after the initial stop.

## REDIRECT TESTIMONY

Trooper Sonstrom recalled that Defendant did not have proof of insurance, a potential misdemeanor traffic violation; just had his driver's license and vehicle registration. TR. P. 68.

## RECROSS EXAMINATION

Trooper Sonstrom testified that it is not mandatory that a driver's name is run through EPIC. TR. P. 69.

## II.    LEGAL STANDARDS

"A vehicle stop 'constitutes a seizure within the meaning of the Fourth Amendment.'" *United States v. Calvetti*, 836 F.3d 654, 665 (6th Cir. 2016) (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In such circumstances, "[a]n officer's mission includes deciding whether to issue a traffic ticket and other 'ordinary inquiries incident to [the traffic] stop.' These 'ordinary inquiries' typically involve 'checking the driver's license, determining whether there are outstanding

warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *Id.* (alteration in original) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015)).

In *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015), the Supreme Court granted certiorari "on the question whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." In the instant case, Trooper Sonstrom called for a dog and trooper backup. The Supreme Court, adhering to its decision in *Illinois v. Caballes*, 543 U.S. 405 (2005), held that a police traffic stop exceeding the time needed to handle the matter for which the stop was made violates the Fourth Amendment: "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez*, 135 S. Ct. at 1612.

The Court began by explaining that since

the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, . . . [a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. See [*United States v.*] *Sharpe*, 470 U.S. [675, 685 (1985)] (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").”

*Id* at 1614. And while the Court's precedent makes clear that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop, . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615.

The Supreme Court's discussion of the components of a traffic stop's "mission" in *Rodriguez* merits quoting in full:

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez*, 135 S. Ct. at 1615 (alteration in original) (internal citations omitted). By contrast, the Court explained, a canine sniff "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing,'" and therefore is neither "an ordinary incident of a traffic stop," nor "fairly characterized as part of the officer's traffic mission." *Id.* at 1615 (alteration in original) (citation omitted). The Court recognized that because traffic stops are especially fraught with danger to police officers, an officer may "take certain negligibly burdensome precautions in order to complete his mission safely," but added that "[o]n-scene investigation into other crimes . . . detours from that mission. So too do safety precautions taken in order to

facilitate such detours. . . . Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at 1616 (internal quotation marks and citation omitted).

Thus, while measures aimed at detecting evidence of ordinary criminal wrongdoing may be permissible during a traffic stop if they do not prolong the traffic stop or otherwise infringe constitutionally protected privacy interests, law enforcement officers may not implement such measures in any way that extends the seizure longer than is justified by the government's interest in carrying out the traffic stop, absent some reasonable suspicion on the part of the officers.

In *United States v. Calvetti*, 836 F.3d 654 (6th Cir. 2016), the Sixth Circuit dealt with drug trafficking discovered in the search of a minivan during a routine traffic stop. The government cited several factors in arguing for such reasonable suspicion, and the court found that reasonable suspicion had existed, explaining that "[a]lthough the government relies on several weak indicators of criminal behavior, it also relies on two strong indicators—[the defendants'] dubious travel plans (driving twenty-four straight hours from Texas to Michigan with a small amount of luggage inconsistent with moving to a new state) and criminal histories (drug-related offenses)." *Id.* at 667. The Sixth Circuit concluded that those two indicators, particularly dubious travel plans combined with criminal drug histories, was enough to create reasonable suspicion. *Id.*

### III.    DISCUSSION

Defendant contends that his prolonged and unwarranted detention exceeded the reasonable time necessary for Sonstrom to complete the investigation of the traffic stop, and that the continued detention was not based on reasonable suspicion of criminal activity. Thus Defendant concludes that the prolonged detention violated his Fourth Amendment rights (under *Rodriguez* in particular), and that the evidence seized as a result of the prolonged detention should be suppressed. The government counters with a two-pronged argument, contending: (1) that the traffic stop had not been prolonged so as to require reasonable suspicion of criminal activity by the time the gun was discovered; and (2) that even if it had been, Sonstrom had reasonable suspicion of criminal activity sufficient to extend the traffic stop.

Defendant does not dispute that Sonstrom had a lawful basis for pulling him over. Thus, the dispositive issues here fall squarely within the *Rodriguez* line of precedent: was the stop prolonged to the point of requiring reasonable suspicion, and if so, was there a basis for reasonable suspicion. For the reasons that follow, the Court answers the first question in the affirmative—the stop was prolonged—and the second in the negative—there was no reasonable suspicion to prolong the stop.

### A.    The traffic stop was prolonged to the point of requiring reasonable suspicion of criminal activity.

Sonstrom had what he needed to decide whether to issue a ticket to Defendant—*i.e.*, Defendant's license and registration—approximately two minutes

into the traffic stop. The nearly 30 minutes that elapsed between the beginning of the traffic stop and the discovery of the pistol, together with certain statements made by Sonstrom that were captured in the video and in his testimony, make clear that Sonstrom's true purpose was the sort of "[o]n-scene investigation into other crimes" which is impermissible under *Rodriguez* absent reasonable suspicion. *Rodriguez*, 135 S. Ct. at 1616. These statements include the remarks that Sonstrom made on the phone: "They're doing something up to no good, you know? Well, hopefully today will be that day, so." (Video at 02:32:43-02:34:05.) They also include some of the statements that Sonstrom made to Zonca shortly after she arrived on the scene: "I've stopped him for the DEA. He's got multiple DEA things going on, but they've just had trouble proving them, but I've spent like 2 hours searching his car before. . . . Uh, he's just—he's dirty," as well as "They're not going to the auction. That's just his—his thing. So I'm going to get her out in a second, and *I'm going to run my dog*. I don't know what he's going to do. He's dirty. I worked with him—I've worked him up on a DEA before." (Video at 02:34:50-02:35:30 (emphasis added).)

Trooper Sonstrom, time and again, testified that he had not yet decided whether to issue Defendant a ticket. Such stalling does not give the government carte blanche to continue detaining the Defendant on the traffic violation. The government recognizes that "[t]here is no magic timeframe for the duration of a lawful traffic

stop." (Gov't Resp. at 7, Pg ID 123.) The question is not whether the traffic stop was so long as to be "unreasonable" in a generalized sense—it is whether this traffic stop surpassed the point at which the "tasks tied to the traffic infraction [were]—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1615. The Court finds that Trooper Sonstrom improperly prolonged the length of the traffic stop past the "time reasonably required to complete [the stop's] mission," *id.* (alterations in original) (quoting *Caballes*, 543 U.S. at 407).

The Court concludes that by the time the troopers searched the passenger's purse and discovered the pistol, the stop had surpassed the point at which the "tasks tied to the traffic infraction [were]—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1615. The Supreme Court has recognized that the "mission" of a traffic stop includes an officer's attending to "safety concerns" related to "the traffic violation that warranted the stop," *Rodriguez*, 135 S. Ct. at 1615, and that criminal-record checks may be justified by this interest in officer safety, *see id.* at 1615. "On-scene investigation into other crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours." *Id.* at 1616 (internal citations omitted).

While the government suggests that because Sonstrom had not yet made the decision to issue the citation as of the time the pistol was discovered, his authority to detain Defendant without reasonable suspicion had not expired before that time.

The Court rejects this argument. Supreme Court precedent holds that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—*or reasonably should have been*—completed." *Rodriguez*, 135 S. Ct. at 1614 (emphasis added). *Rodriguez* thus makes clear that there is an objective component to this standard, and it would eviscerate the holding of *Rodriguez* entirely if the government could avoid having to show reasonable suspicion solely because the officer had not determined whether to issue a ticket before engaging in the challenged search or seizure. *See Rodriguez*, 135 S. Ct. at 1616 (explaining in the context of canine drug sniffs that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop") (internal quotation marks and citations omitted).

Professor Wayne LaFave's treatise on *Search and Seizure* (5th ed., updated 2017) highlights these pertinent issues:

1. Whether the officer was "stalling" to facilitate prolonged improper questioning, after the traffic stop should have ended, or dealing with the valid purposes of the traffic stop: license/registration check, ticketing or warning. 4 LaFave, *Search and Seizure* § 9.3(d) nn. 256-63 (5th ed.).

2. The objective of travel plan inquiries is not to gain some insight into the traffic infraction providing the legal basis for the stop, but to uncover inconsistent, evasive, or false assertions that can contribute to reasonable

suspicion or probable cause regarding drugs. Thus questions about travel plans are investigatory rather than merely conversational. 4 LaFave, *Search and Seizure* § 9.3(d) nn. 291-93 (5th ed.).

The Court concludes that Trooper Sonstrom's statements demonstrate that he was acting more from a "general interest in criminal enforcement," *Rodriguez*, 135 S. Ct. at 1615, than from an interest in executing the mission of the traffic stop or protecting his own safety. Accordingly, the Court rejects the government's contention that no showing of reasonable suspicion is necessary because the authority for the traffic stop had not expired by the time the gun was discovered.

The Court finds that the traffic stop was extended past the time it "reasonably should have" taken for Sonstrom to perform the "ordinary inquiries incident to [the traffic] stop." *Rodriguez*, 135 S. Ct. at 1615 (alteration in original) (internal quotations omitted) (quoting *Caballes*, 543 U.S. at 408).

## B. The officers did not have reasonable suspicion of criminal activity necessary to justify prolonging the traffic stop.

The government must establish that "something happened during the stop to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [was] afoot." *Calvetti*, 836 F.3d at 665–66 (internal quotation marks omitted) (quoting *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 1999)).

"In forming reasonable suspicion, officers may draw on their 'experience and specialized training to make inferences from and deductions about the cumulative

23

information available to them that might well elude an untrained person.'" *Id.* at 666 (internal quotation marks omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "While a 'mere hunch' is not enough, 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.* (quoting *Arvizu*, 534 U.S. at 273). The court must consider "the totality of the circumstances" in making this determination, and "[t]he government, in establishing reasonable suspicion, cannot rely solely on 'relatively minor' factors that are 'subject to significant qualification.'" *Id.* (quoting *Stepp*, 680 F.3d at 665).

Here, the government argues that the following factors together gave rise to reasonable suspicion of criminal activity:

- When Trooper Sonstrom asked Gordon to exit his vehicle Gordon was confrontational;

- On more than one occasion, Gordon asks for his ticket so he can leave, which was suspicious;

- When asked about his travel plans, Gordon vaguely indicated that he was going to a car auction, but did not know what kind of car he planned to buy;

- The passenger in Gordon's car had no idea where she was going— which was different from Gordon's story;

- When asked about his criminal history and if he had ever been in trouble, Gordon's demeanor changed;

- Minutes after beginning to process Gordon's information, Trooper Sonstrom learns that Gordon is lying about his criminal history;

• Trooper Sonstrom learns that Gordon is under investigation by the DEA after learning of a positive NADDIS hit; and

• While Expose's purse is searched, Trooper Sonstrom observes Gordon and Expose whispering to each other and Gordon is visibly nervous.

(Gov't Resp. at 11-12, Pg ID 127-28.)

First, the Court finds that the video, and indeed, Sonstrom's testimony, undermine the government's claim of Defendant's confrontational conduct. The video reflects that Defendant did ask shortly after being pulled over whether he was required to exit his car, but it also indicates that both times that he questioned the nature of his detention, he did so calmly and with a statement that he did not intend to be disrespectful. The same can be said of Defendant's "ask[ing] for his ticket so he can leave" (Gov't Resp. at 11, Pg ID 127), which was little more than a calm objection to the length of the detention, given Sonstrom's testimony that he was deliberating whether Defendant would receive a traffic ticket or a warning. The Court concludes that Sonstrom's claim that he was considering whether to issue a traffic ticket or a warning, was really a delay to continue investigating other possible criminality. The video, the most direct evidence of the interaction between Defendant and Sonstrom, undermines the government's first two factors: Defendant being confrontational, and Defendant acting suspicious because he asked for his ticket so he could proceed on his drive.

Further, the Court finds that the government's assertion that Defendant's

"demeanor changed" in response to Sonstrom's questions regarding his criminal history (Gov't Resp. at 11-12, Pg ID 127-28) is insufficiently evidenced to support a finding of reasonable suspicion. No such change in demeanor is mentioned in the incident report or apparent from the video, and Sonstrom's testimony regarding Defendant's reaction to those questions was simply that Defendant was "evasive" and that "[h]e didn't want to be there" in a general sense. TR. P. 23-24. The government's argument as to Defendant's change in demeanor is, at most, a restatement of its argument concerning Defendant's demeanor generally, and that factor is afforded little weight for the reasons stated previously.

The Court also finds that Defendant's use of a cell phone during the prolonged traffic stop "does not establish a reasonable suspicion of criminal activity." *Johnson v. Thibodaux City*, 887 F.3d 726, 734 (5th Cir. 2018)

That Defendant could not specify the type of car he intended to buy at the auction, and that Expose was along for a ride, do not support the government's reasonable-suspicion argument based on inconsistent travel plans either. Car auctions involve many cars put up for sale. You go, you look, if you like, you buy. There is nothing suspicious about Defendant's response that he did not identify a particular car that he intended to buy. Ms. Expose's response that she was going for a ride with her boyfriend, and did not know where they were going, did not contradict Defendant's explanation that they were going to a car auction. The Court concludes

26

that the facts do not indicate dubious travel plans.

With regard to the pistol seized after the search of Ms. Expose's purse, the Court notes that to extend the stop and make the search, reasonable suspicion must have developed *before* the seizure. Reasonable suspicion "cannot be justified by facts that become apparent only after a seizure." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (citing *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008)).

The remaining two factors cited by the government are related to Defendant's criminal history: First, Trooper Sonstrom's discovery that Defendant had a criminal record, after his having answered the question of whether he had ever been in trouble in the negative, and then his non-response to the question of whether he had ever been arrested. Second, Sonstrom's discovery that Defendant was "under investigation by the DEA after learning of a positive NADDIS hit." (Gov't Resp. at 12, Pg ID 128.)

Indications of a defendant's "relevant criminal history" can contribute to an officer's reasonable suspicion in certain circumstances. *Calvetti*, 836 F.3d at 666-67 (citing *Stepp*, 680 F.3d at 665). In this case, focusing on the facts contained in the video and at the evidentiary hearing, the criminal history factors do not create the level of reasonable suspicion necessary for the extension of the traffic-based stop. "If an officer can complete traffic-based inquiries expeditiously, then that is the

amount of 'time reasonably required to complete [the stop's] mission.' [A] traffic stop 'prolonged beyond' that point is 'unlawful.'" *Rodriguez*, 135 S. Ct. at 1616 (alteration in original) (internal citations omitted) (quoting *Caballes*, 543 U.S. at 407).

Because Sonstrom was not presented with indicators of any particular criminal activity underway during the time that his seizure of Defendant was still justifiable pursuant to the traffic stop, the Court finds that this case falls into the "hunch" category, and that the extended 29-30 minute length of the stop violated Defendant's Fourth Amendment rights based upon the Supreme Court's decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion to Suppress the firearm.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

**JUN 1 1 2018**

Dated: _____

28